Thank you. Good morning and welcome. If the lawyers would be kind enough to identify themselves. First we'll call the case. Case number 10-2516, Eagle v. Brian Jones. Good morning. Assistant State Attorney Jessica Ball on behalf of the people. Thank you. Your Honor, Dean Moriaska. Good morning. Good morning. Mr. Moriaska. Your Honors, may it please the Court. Obviously the fundamental issue in this case, which was raised in appeal, is ineffective assistance of counsel, and I believe that the primary issue and the first one that I mentioned was the cross-examination of failure to cross-examine Sheree Jackson in regard to what I believe was clear impeachment in regard to this case. And I believe that under the standards of Strickland, the failure to do so. In regard to a witness who was the key corroborative witness of the case, did affect the outcome of the trial? Well, one might think it was the key corroborative witness, Mr. Moriaska, had the facts been as you expressed them in your opening brief. But I'm more than a little troubled by the facts that you omitted from your brief. I will concede that the first way I look at a case is I will read the briefs in the order in which they're filed, and then we'll look at the record. And I was very disturbed to see that in your brief the following facts were not even mentioned, that Jones was arrested running out the back door bare-chested, that the blue and white shirt was found in the apartment, that it had been ID'd as the shirt that Sergeant Medina saw the defendant wearing as he fled in the red car, that the engine in the car was warm, according to Sergeant Medina, that the identification by priest was not at a long distance, that it happened when the defendant, according to him, came up to him, and that he was immediately identified as Bird, a name that he admitted to be known by, and photo-identified to the police immediately upon their arrival. All of those things are important facts about whether this Cherie Jackson was indeed a key corroborative witness, and if we get to the second prong of Strickland, whether or not that makes a difference in the context of this case. So I will just say that when I read briefs and I find out key facts only in the appellee brief, it doesn't do wonders for either the credibility of the attorney or the credibility of the argument which they're making. Well, Judge, I'm certainly not trying to hide evidence from the court. The record speaks for itself, and I'm not known to do so. So my argument still, I am aware of those facts, and I still believe that Cherie Jackson was a key corroborative witness in the case. Even accepting that those facts are part of the record in this case, there's certainly circumstantial evidence which ties the defendant to the scene, but they don't put a gun in the defendant's hand, nor do they provide a third-party admission of his being involved in this offense. And so the colloquy that I presented to the court between the attorney for the defendant at trial and witness Cherie Jackson was placed there for the reason to put it into context, that I believe that there was impeachment there that should have been followed up on, and that the failure to pursue that impeachment prejudiced Mr. Jones. I know that the state raises the issue of, well, you can't really speculate in terms of, you know, what was said between counsel and Ms. Jackson, but I believe that clearly counsel would not have asked the witness the questions that were asked had that witness, Ms. Jackson, said something, said the same thing that she had told him. There would be no reason to ask those questions. In addition, counsel indicated, and it's also in the colloquy that's quoted, I believe on page 16 of my brief, that he was surprised by the answer that Ms. Jackson gave. And the only inference, it's not speculation, I think the only inference that can be drawn is that Ms. Jackson had told counsel that she did not see the defendant with a gun and that she had not heard him say, I had shot someone. And, you know, everybody here has tried a lot of cases. And in any case where your defense counsel, obviously you're hoping that the significant corroboration in an identification case is lacking. And when you're the prosecutor, you're praying for significant corroboration in an identification case. And in this case, Cherie Jackson was, again, the key corroborative witness who the state's theory, you know, put a gun in my client's hand and provided a third-party admission. And I do not see that there was any trial strategy reason for counsel to pass up on that opportunity to do cross-examination of this witness. The state mentions or argues that my client acquiesced in the decision when it's announced to the court, you know, counsel said, you know, we've talked to Mr. Jones about this and this is how we're going to proceed. In the cases that are cited by the state, such as, for example, Anderson and those other cases, the trial court specifically addressed the defendant in those matters. And the defendant addressed the trial court in regard to whether he or she was acquiescing in that strategy. In this case, that did not occur. And the defendant... Well, but the only difference in this case would be not in the acquiescence because the court inquiry wouldn't have revealed any other kind of an answer, even according to the client's affidavit. It's a question of whether it was fully discussed in your definition of fully discussed, really. Because there's not a denial that it was discussed. Well, I guess the denial is from my client's, from the petition itself and from my client's affidavit is that it was fully discussed, that he knew what indeed was going on. And regardless of whether he did or not, Judge, my position is that there was no trial strategy reason not to pursue this impeachment. In a case in which, even granted the facts that Your Honor mentioned earlier that I had neglected to put in my brief, that even considering those facts and the identification of Lance Priest, that this was a vital, important, crucial witness in this case. And I don't think that that can be denied. I think one can disagree or agree whether if this impeachment had been conducted, whether what that impact would be, but it's our position in this case, given the facts of the case, that the impact would have been significant, especially given it was just a bench trial before Judge Suri. So I do not believe that my client adopted the strategy that the defense counsel had mentioned in that case. And we believe that the evidence in this case overall from the petition itself and the arguments that are made, established that there was ineffective assistance of counsel, at least in regard to the failure to cross-examine Shuri Jackson. The second issue that I raised in the post-conviction was the failure to call Byron Manson and Bossie Lester. Isn't that a classic trial strategy question? Because as the State points out in their brief, even ignoring the fact that there were State witnesses and the State was saying we want a continuance to get these witnesses in, and the trial counsel is vehemently objecting and hoping that these witnesses are not going to come in, which indicates that it's their trial strategy to hope that these witnesses don't appear. But at the best, what you're having is something where these people, if they are called, they're going to have contradictory statements under oath or contradictory statements introduced as to the facts of the case. Judge, I understand what you're saying. But, I mean, as defense counsel, I mean, if you're, I guess, if you put it under the rubric of trial strategy, it's protected in all circumstances, it's not ineffective assistance of counsel. I don't see that in this particular case. And here's why. What time was this shooting? 2 a.m. 146 maybe? Between 1 and 2, isn't it? I thought it was closer to 2 a.m. Was it when his alibi was presented that he was gone, he left that apartment, and they were still there? No. I know that counsel refers to that on page 29 of the brief, but the affidavits say something different. Well, are they contradicting his girlfriend's testimony then that was already presented regarding his alibi? She said she was with him, didn't she? And that they left, they went to the liquor store, they bought beer. Didn't she say that was, like, between 1 and 2 in the morning, or am I wrong? Well, the affidavits of Byron Manson and Quasi Lester state that Brian Jones and Ms. Matthees left the apartment about 1245 to 1 a.m. to get beer. They were back in the apartment before 149 a.m. on August 17th of 2009. Well, at trial, what did his girlfriend say as far as when she left with him to get the beer? I believe she had said it was earlier than that, Judge. Earlier? Like what time? That I honestly don't remember, Judge. I honestly don't remember. But they gave other statements, well, supposedly to the police. The police reports say that they have statements which contradict the testimony which was proffered. I understand. But here's my position on that, Judge, is that the first problem is by affidavit of these two individuals, they weren't even interviewed by defense counsel. So I don't know how you make an evaluation in a murder case of whether you're going to call a witness or not when you don't interview. But even if you're right that it wasn't trial strategy under those circumstances, it's a who cares situation, isn't it? Because what they add to the case is contradictory statements that would establish, if nothing else, that they've told two different stories about a murder case on two different occasions. I don't see it in that same way, Judge, and here's the reason. I mean, the contradictory statement emanates from the police report that was written in regard to the case where the police say, make a statement, that's the reason the affidavit says, Brian Jones did not leave the apartment alone before 145 a.m. and arrived back at the apartment alone between 2 and 2.30 a.m. Any statement in the police report or my handwritten statement that I told the police that Brian Jones left the apartment before 140 a.m. alone and returned between 2 and 2.30 a.m. is false. I did not say that to the police. I think that if you have the attitude that you don't interview a witness and just because something appears in a police report, a statement appears in a police report, to me that's deficient. Even if they're going to be impeached later with this suggestion that they originally said something else? Sure. Show me a case that says that. I don't have a case that says that. Even though I haven't found one. Your Honor, if you couldn't find it, then nobody would. No, I don't have a case that says that. What I'm saying here is that these two people have signed affidavits saying that they were eyewitnesses to the defendant's alibi. And even given the fact that they would have potentially been impeached with their statements to the police, still they had something to offer the defense in this case. Because otherwise, here's the situation you had. You had a defense that was. Well, I think the lawyer not calling a witness that's going to be impeached indicates even further that that's a pretty sound strategy. Well, I think you're left. From my standpoint, you think it through. Because what you're left here, Your Honor, is a situation where the defendant was left alone in his testimony with Ms. Matthews, who admitted that she committed perjury. And without two witnesses who the defendant and Ms. Matthews placed there as alibi witnesses and who were his friends and who didn't testify. As opposed to a situation where these individuals would have testified to an alibi for which they'd already been indicated as having been present. And there would have been some impeachment through a police report. No, not through a police report. Through a police officer who would testify that they said something contradictory in an earlier. It's not a situation where there's an inanimate object that's going to impeach them. I mean, the testimony of the investigating officer. Right. Right. As well as the handwritten statement. I understand that. I understand that. The prejudice prong is probably your biggest hurdle. I mean, you're portraying this as somewhat flimsy in terms of the evidence. But you do have a solid ID early. You have a name of an offender, Byrd, as Judge Epstein pointed out. And then he's identified. The police are directed to his address. He's arrested. He's identified. I don't know if you mentioned or forgot to mention in the facts the two police officers that identified him in the red car. Then you've got the red car. Then you've got the checkered shirt. The warm red car. Yes. And, you know, so in addition, you have that statement and the witness who saw him with a gun, which, of course, you know, you're saying. Well, I guess when you're on this side, Judge, I'm arguing that. Yeah, I know. But I think the prejudice prong, I think you can certainly argue with a, you know, straight face. Straight face that, you know, some of these things could be argued as ineffective and lacking strategy. But the prejudice prong, I think, is tough to beat here. Because I think the evidence is, you know, overwhelming in terms of, I mean, you do have these other officers, too. And he flees at the time that they're arresting him, too. He's running out the back door without the shirt on. So that's just another layer. Judge, I understand. But, you know, from my standpoint where I am right now, to me, when you're trying a case, the corroboration of somebody saying that they saw your client with a gun and he admitted committing a shooting in an alibi case where two of your alibis you put there and they're your people and you don't interview them, I mean, to me, I have to argue that that amounts to prejudice in this case. Otherwise, I wouldn't be, you know, I shouldn't be here. The final thing I wanted to say was, I'm not going to argue all the points that I raised, but tying into the alibi was, and this is not in and of itself an effective assistance of counsel, but I wanted it read in terms of the context of the failure to call the alibi witnesses in addition to the failure to impeach Sheree Jackson was the manner in which the alibi was presented to the court in terms of, and I know this happens, people get busy and things happen, but filing an alibi notice two days after the trial started is a problem. Help me understand your argument, Mr. Marask, about how this does fit in. Because where the court allowed the alibi defense to be filed, I mean, is it limited to some unstated visceral reaction that you imply that a judge might have to something that is raised late as opposed to something that is presented early, or is there something more? Well, there is something more, though. I did put that in the brief, and I certainly don't expect the court to act on, you know, whether one could speculate how Judge Surya necessarily was affected by the presentation, though I will say that it's common sense. I don't think, I've never been a judge, but if I was a judge and somebody presented an alibi defense two days after your trial had started, I'd have to raise an eyebrow in terms of the credibility of that defense. But the more important point, I think, is just the overall strategy and the manner in which the case was conducted. It did not appear, the reason that I raised that, as well as the issue of reserving opening statement, not calling the alibi witnesses, because it is, I believe one can draw the inference they were not prepared to try this case. Well, you know, it's interesting in the context that you raise that, because as you had intimated in your colloquy with Justice McBride, you deal with what you have as a lawyer. And as you look at it now, was there a screamingly effective defense that they would want to commit themselves to in an opening statement in this case? If so, please tell me what it is. Well, I don't think as defense counsel you ever commit yourself into a situation that you cannot extract yourself from. So I think in that situation, I just believe, and maybe I'm going far afield from ineffective assistance of counsel. I'm with you. I think you've got to make up your mind at least what your spear point is when you go into a trial. And you keep your options open, obviously. But in an alibi case, obviously you have to notice that. You have to provide who those witnesses are. So you have your alibi witnesses who all three of them, if they actually testify to what the best case scenario of their testimony will be, all three of them will be impeached. And you know that. Correct. And so is it something that isn't it within the realm of trial strategy to say, under those circumstances, we're going to keep our options open and see how the witnesses perform? I mean, it may not be the way you or I would choose to do it. Right. No, and I understand. I guess my position is no, not when you don't talk to them. I mean, suppose the defense attorney sits down and talks to these two guys and they tell them, well, look, they told us that we weren't going to leave there until we told them what we wanted to hear and all that kind of thing. I mean, you know, everybody knows that there are reasons sometimes people say something in a police station that they don't testify to later on in court. And I just don't think you abandon pursuing an alibi when they're the people who, if you're going to present evidence, they're the people who've got to, you put them there. What time does their affidavit say that he left? Between 1245 and 1 a.m., Your Honor, with Ms. Matthews. And then he did not. Matthews, at the original trial, testified that they went out at midnight. She left with the defendant at midnight to get cigarettes, and that he left again at 3. And then at the original trial, the defendant testified that he left at 1 a.m. So I was correct. He testified that he left at 1, but she testified that they left at midnight. That was in the original trial. So there was testimony that he left at 1. There really wasn't any testimony about when he came back, was there, except that he left again at 3. Correct, correct, correct. You know, again, I understand Your Honor's point, and I had no doubt that you were correct when you said that before. Well, I knew someone said 1 a.m., so it was the defendant. Right. I mean, some of the, you know, there are estimates in the affidavits from both Mr. Manson and Mr. Lester. So now that they say, what time is it? Midnight? When did they say he left? Jones and Matthews left about 1245 to 1 a.m. to get cigarettes. So they sort of fit in with this. Yes. I'm not saying that these are not problems, but I guess what I'm saying is that if you put it all together, then can you say that this was unreasonable trial strategy when you've got, you know, the defendant saying 1, you've got her saying midnight, and then you've got two people who originally said they don't help this alibi, but now they're going to change the time. So you've got a real time problem. In this case, I do, because I have to. Yes. But not only that, but because you didn't interview. I mean, you didn't talk to him. And that's a problem. But at best, though, he knew that if what they were going to testify to that, he knew that if he did put them on and they testified as in that affidavit, he knew that there was going to be some police officer who would later take the stand and say they told something different at an earlier time. I think that, but when you. And so it wouldn't be reasonable for the trial lawyer to say, well, I'm not going to muck it up anymore. In this particular case, I believe it was objectively unreasonable, Your Honor. And with that, I will rest on my brief. Thank you very much, Mr. Morales. Ms. Ball. Good morning again. Your Honors, with respect to the issue of Cherie Jackson, the defendant's entire argument is based on assumptions that are not supported by the record. There is absolutely no affirmative showing that Cherie said anything inconsistent or different to this attorney. But isn't it reasonable to assume under these circumstances? No. Absolutely not. Is that what the lawyer did in court? Aren't you making an argument that you really don't have to make? But it's up to you. Well, I'd like to point out one of the things that defense counsel said here, which is that the only inference to be drawn from his statement that she was surprised, or that he was surprised, which is the only thing he has to argue, that's one heck of an inference to jump. But if you're arguing that really the record doesn't support it, doesn't that feed into the argument that we have, for example, in McKeel, that you have a circumstance where there's information outside the record that's necessary to be determined to decide whether the post-conviction should be dismissed or not? Because if we really have to find out what this witness said according to what the defense attorney would say, and how it fits in to all this, and why he didn't call or chose not to impeach, doesn't that imply that the proper ruling would be to remand? No. I think what that implies is that the proper thing that should have been done initially is that the defense should have included an affidavit from this attorney, because we are in post-conviction land and territory, where evidence outside of the record is where it's all about. He had his opportunity to obtain that affidavit. He failed to do so. He absolutely could have. And in addition to not having that affidavit, he doesn't even provide an explanation for why he didn't get one. But that aside, even if you want to sue. Well, can't we rely on some of the cases that say that when you're really seeking to show that the defense attorney at trial was ineffective, don't we recognize through our precedent that that's often a difficult affidavit to obtain from the lawyers? Those precedents also say that in those instances, the defendant has to provide an explanation for the absence of that affidavit. But don't we know that these things, I mean, we know that the defendant wasn't on the phone call to Ms. Jackson. It would be a very unusual set of circumstances were he to be present. So it would be uniquely within the information of the defense attorney. It would be something that should be in an affidavit. You're right. The knowledge in the affidavit of the attorney. In the absence of that, and if the defendant was not able to obtain one because the allegation is ineffective assistance, his duty by statute is to provide an explanation for the absence. But isn't the explanation sort of apparent in this case? Even assuming it is. We'll go to the next issue. There is it. There you go. Which is, even assuming Cherie said something inconsistent with what she said on the stand to the attorney, what you have here is gamesmanship. It was good trial strategy. Assuming this happened, assuming she said something inconsistent, then he would have been required to disclose that to the state. He chose not to do so. Instead, he hoped to sandbag the state at trial and take us by surprise. He figured she would say something inconsistent on the stand and wouldn't have to prove it up with any impeachment evidence. It didn't happen for him. And even if Cherie on the stand didn't say anything inconsistent, which is what she did at trial, then the attorney knew he could still choose not to prove it up. They had two attorneys, not one defense attorney, but two co-counsel on this case. So it would have been very easy for one of them to become a witness. But these two attorneys together determined that that impeachment was not necessary. That's legitimate trial strategy, especially where even without proving it up, what you're left with is the impression or the suggestion that there's something inconsistent out there. And she had already been impeached on these points. So you have the attorney remaining on the case as an attorney. You have the suggestion that something inconsistent happened out there. It's a win-win for the defense. And counsel mentioned that he had the sworn affidavit from the defendant. But as the case law represents and stands, and even the statute, that sworn verification doesn't substitute for an actual affidavit from the defendant supporting his claim. That's lacking. The defendant's cases, Vera, Skinner, and Garza, are all distinguishable from the ones here. In those cases, clear-cut evidence existed with which to impeach the eyewitness. And the attorneys failed, completely failed, to impeach those eyewitnesses on critical points. Here, there's no evidence demonstrating how this attorney would have impeached her. And Jackson was not an eyewitness. And the attorney did not fail to impeach her. And the defendant agreed not to call the attorney as a witness after having it fully discussed with him. That's what the record says. As for the conversation over the phone, whether or not that should have happened or in person, Cherie probably didn't want to talk to that attorney in person. And it might not have been safe for her to do so. And as Your Honor mentioned, there's no prejudice here. There was more than sufficient evidence to convict. We presented two eyewitnesses from the state. Lance had known the defendant for four years. He identified his face. Pritchett, Raleigh Pritchett, corroborated that idea with a clothing description and a physical description. There were two police officers who saw the defendant in the checkered shirt, in the warm red car. And the defendant was found nearby with his shirt, and his alibi didn't hold up. And on direct appeal, this Court already said that Lance's positive identification of the defendant was sufficiently reliable to sustain his convictions. The defendant also overstates the importance of Jackson's testimony. She was not a key corroborative witness here, as Your Honor pointed out. She was not the only one to see him with a gun. She was not the only one to place him outside of the apartment at the time of the shooting. And his statement that he shot him, Mo, is not exactly a confession. He also overstates the importance of what that attorney's testimony would have been. It would not have been significant. It would have been impeachment, not substantive evidence. So it certainly cannot be ineffective assistance of counsel to not impeach Cherie Jackson with something that didn't exist. And even if impeachment did exist, it was a strategic decision not to use it. That evidence was cumulative. As for Byron Manson and Quasi Lester, it cannot be ineffective assistance for a defense attorney to not interview state witnesses who were both under state subpoena where the state sent investigators out to arrest them and bring them to court for testimony when their statements to the police and Manson's handwritten statement contradict his alibi defense. It's completely proper for a trial attorney to make a strategic decision to not interview witnesses. Oh, I would think that clearly it's best practice. We're talking about you may be overstating the case. I think you probably always want to know what the witnesses are going to say, and it's best practice to do it. The question is whether under the precedent that we have here it's ineffective assistance not to do it. Not in this case, because you have to look at what the value of the testimony would be and what they knew from the trial record, from the police reports and everything there. But you don't know what the testimony is going to be until you talk to the witness. That's fundamental. That's axiomatic. But he knew what the value of the testimony would be because he knew that if they testified inconsistently with those police reports, they'd be impeached. So the value of an inconsistent later statement is not going to benefit his client. These witnesses basically did what they could to help the defendant. They didn't show up at trial, so they couldn't testify against him, and they provided post-trial affidavits trying to exonerate him. But again, there's no prejudice. That's the hurdle here for the defendant. On direct appeal, this Court stated that the trial court is not obligated to accept alibi testimony over a positive identification of the accused. And the trial attorney does not have to accept those affidavits as true if it's inconsistent with the trial record. So it's certainly not going to be ineffective assistance of counsel to not interview or call Lester and Manson as witnesses. They would have done more harm than good. And with respect to the way that the attorneys presented this alibi defense, they did everything that they could. They presented everything that they had. They called Lysandra Matthews, who said that the defendant was with her at the time of the shooting and that the defendant didn't have a gun. They called the defendant who said, I was with Matthews and I didn't have a gun. And then they called Robert Burke, the expert who testified that the defendant didn't have GSR in his hands. They cross-examined all the witnesses. They impeached all the witnesses. Really, the attorneys did a commendable job, especially given what they had and what they were presented with. The fact that they reserved opening statement is a very good trial strategy. It allowed them to refocus the trial court's attention on what was important to the defense, especially since it was a bench trial that had been commenced and continued a few times. And, as Your Honor pointed out, it allowed them to keep their options open. As for the late filing of the alibi defense, again, where's the prejudice? The defendant was not prevented from presenting any evidence or argument on his alibi defense. If Your Honors do not have any other questions, the people would rest on their brief and respectfully request this court to affirm the trial court's denial of the defendant's post-conviction petition. Thank you. Any final words, Mr. Moresk? No, unless Your Honor decides it should be repetitive, unless Your Honor has any other questions. Thank you. I take the case under advisement. Thank you both for an interesting and well-presented argument, and we'll issue a ruling in due course. The panel will change for the next case, so we'll be taking a brief recess.